## Goodrich & al. *v.* The Eastern Railroad.

The plaintiffs, being the owners of a tide-mill, authorized the defendants to maintain a bridge, resting on piles, across their mill-pond, and to modify the structure and supports in any way that might be deemed proper, to secure and preserve them, and released all damages on account of the bridge, and of any future modification of it; with a proviso, that

if it should be so altered as to increase the damages to the mill-pond, by diminishing the quantity of water, or otherwise impairing its efficiency, the plaintiffs should not be prejudiced in their claim for further damages. The plaintiffs subsequently released to the Portsmouth and Concord Railroad that part of the pond on which the bridge stood, bounding the premises released by the northerly side line of the bridge, saving and excepting all right, title, interest and privilege before conveyed to the defendants.

The Portsmouth and Concord Railroad subsequently conveyed to the defendants the land under the bridge, with the right to fill up and make solid the space under it, and to *slope* the northern side of the embankment by a wall, or otherwise, into the mill-pond. The defendants filled in an embankment of earth about the piles under the bridge, which in filling in was allowed to run out to its natural slope, into the mill-pond, some distance beyond the northerly side line of the bridge:

*Held*, that the embankment was such modification of the bridge as was intended by the parties in the release of damages from the plaintiffs; that the defendants, having proceeded to make the embankment upon the understanding expressed in the proviso, that the plaintiffs were not to be prejudiced in their claim for further damages, a promise to pay those damages was implied, and the plaintiffs might maintain assumpsit therefor ; that the saving clause in the release from the plaintiffs to the Portsmouth and Concord Railroad was not such exception or reservation as preserved to the plaintiffs their right of action for the further damages occasioned by the embankment, so far as it was confined to the premises released to the Portsmouth and Concord Railroad ; but that the right of action remained to them for the actual damages occasioned by the running out of the embankment into the mill-pond beyond the northerly side line of the bridge.

ASSUMPSIT, in which the plaintiffs claim such damages as they reasonably deserve to have for the injury to their mill and privilege, at the North mill-pond, in Portsmouth, occasioned by the defendants, in altering, with the permission of the plaintiffs, their railroad structure across said pond, by throwing into it a large quantity of earth, and thereby displacing the water. The declaration alleges a promise by the defendants to pay said damages. The action was referred to a trial commissioner, who reported the following facts: In September, 1843, and long before and ever since, the plaintiffs were tenants in common and

owners of the mill mentioned in the declaration, at the outlet of the North mill-pond, in Portsmouth, and of the privileges appertaining to said mill, being the same mill and privileges granted and conveyed by Gideon Walker to John Bowles, by deed of October 9, 1802, "for the purposes of grinding bark and any other uses and purposes relating to tanning, or to the manufacturing of leather." Said deed contains the following clause: "It is further agreed, that when the water is drawn out of said pond by the said parties, or their heirs or assigns, or either of them, until the top of a certain rock in said pond, southerly of said Walker's mills, shall appear, where there is the date of the present year, (1802) cut or ingraved; then when said rock and upper ingraving appears above water, then said Bowles, his heirs and assigns, if requested by said Walker, his heirs, or assigns, shall cause his said mills to stop until the next tide, and no corn, wheat or grain is to be ground by said Bowles' mill."

One William Rand was, in 1843, and still is, owner of other mills on the same pond, which is mainly tide water, though helped somewhat by a stream of fresh water which flows into it. One George Raynes has a mill upon said pond, under a grant from said Rand, with gates, drawing about the same water as the plaintiffs'. At ordinary high tides the rock is covered about four feet deep. There has not always been water enough for all the mills, but usually they can all be run except in an extremely low course of tides. The mills can all run about half the tide, or three hours, before the rock appears, and then about three hours more with less head of water.

The Eastern Railroad Company, by their charter, are authorized to lay out their road not exceeding six rods in width.

On the 8th day of October, 1843, the defendants having, with the consent of the plaintiffs, constructed their railroad over said pond, upon a bridge resting on piles driven

nearly perpendicularly, two of the plaintiffs, to wit, Jeremiah D. and Moses H. Goodrich, executed, under their hands and seals, a release to the defendants of and from all damages and claims for damages which had arisen by reason of building and maintaining said railroad over said mill-pond, and all right to contest or question, either in law or equity, the authority or right of the defendants to construct and maintain or modify said railroad structure. The following provision is contained in the release: "We do hereby, for the consideration aforesaid, empower and authorize the said Eastern Railroad in New-Hampshire to modify and alter the structure and supports of said railroad in said mill-pond, in any way that may be deemed proper to secure and preserve the same, or to effect the purpose of said railroad; provided, that if the present structure of said railroad across said mill-pond shall be so altered as to increase the damages to said mill-pond, or parties, by diminishing the quantity of water in the pond, or impairing the efficiency thereof, the said Jeremiah and Moses are not to be prejudiced in their further claim for any such increased damages." The consideration expressed in the release is one hundred and forty-five dollars paid by the defendants, and in the preamble of the release it is recited that the releasors had agreed to receive said sum in full for all damages which had been occasioned by the construction of the railroad, and of all such as might arise from any modification of the structure.

The two plaintiffs who did not execute said deed assented to the arrangement, and claimed no other damages than were paid to their brothers and co-tenants for the original injury by the railroad.

On the 8th day of May, 1849, the plaintiffs executed a deed to the Portsmouth and Concord Railroad, whose track runs a few rods south-easterly of the said track of the Eastern Railroad across said pond, releasing and quit-claiming "all that part of the North mill-pond in said

Portsmouth, which lies southerly or south-easterly of the northerly or north-westerly side lines of the Portsmouth and Concord Railroad, and of the Eastern Railroad in New-Hampshire, commencing on the northerly or north-westerly side line of said Portsmouth and Concord Railroad, at the Creek, so called, near land of Robert Ham, and following said line until it strikes that bridge of the Eastern Railroad in New-Hampshire which is situated next westerly from their dépôt in Portsmouth; then following the northerly side line of said bridge until it strikes the easterly shore of said pond, at high-water mark, saving, excepting and reserving all rights, titles, interest and privileges which have been heretofore by us, or those under whom we claim, or any or either of us, conveyed to said Eastern Railroad in New-Hampshire; and it being further understood that said Portsmouth and Concord Railroad are to construct or cause to be constructed suitable and proper culverts to allow all the water running from the southerly or south-easterly shore of said pond into the same, freely to run into said pond, notwithstanding any embankment which may be made therein; and it being further understood that the space, or that part of said premises lying between the northerly side line of said Portsmouth and Concord Railroad and said northerly side line of said Eastern Railroad bridge, in said North mill-pond in New-Hampshire, and easterly of the point where the said northerly side line of said Portsmouth and Concord Railroad strikes said bridge, will not at present be used otherwise than as now used and occupied; and that whenever said space may be otherwise used or occupied, said Portsmouth and Concord Railroad shall, on demand, pay said grantors or their representatives the further sum of three hundred dollars," the consideration named in said deed being fifteen hundred dollars.

Said further sum of three hundred dollars was paid to the plaintiffs before any change was made in the use of

said space by the Portsmouth and Concord Railroad, and said Eastern Railroad paid the same to said Portsmouth and Concord Railroad.

On the 8th day of May, 1850, said Portsmouth and Concord Railroad, claiming under said deed, conveyed to said Eastern Railroad that part of the North mill-pond lying between the north side line of the Portsmouth and Concord Railroad, and the north side line of the Eastern Railroad bridge, "together with the land under said bridge, and the right to fill up and make solid the space under said bridge, and between said lines and to the land, when the same shall be so filled up and made solid, together with the right of sloping, by bank-wall or otherwise, the northern side of said embankment into said mill-pond."

In 1850 the defendants filled the space about their piles and under their bridge solid, so that the railroad now appears to rest on a solid bank of earth instead of a bridge, as at first constructed. The bridge was at first built by laying caps across the road on piles, and upon these caps stringers running lengthwise of the road. The caps projected about three inches outside of the stringers. In the filling, earth was dumped off the track, and allowed to run out to its natural slope, and was filled as high as the top of the stringers, so as to cover the caps. In some places the earth is a few inches further into the pond at the level of the top of the caps, than the caps are.

The embankment is now, and was at the date of the writ, about nine or ten feet high, and several hundred feet in length. The slope is not far from forty-five degrees, and measures about fifteen feet upon its surface. Ordinary high water mark, when the water is four feet deep on the rock marked "1802," is about mid way of said slope, or seven and a half feet out side of the piles of the bridge, so that if the defendants have not the right to a sloping bank, they have diminished the amount of water in the

Goodrich *v*. The Eastern Railroad.

pond to the injury of the plaintiffs and the other owners, by the solid contents of a bank about $7\frac{1}{2}$ feet at the top, sloping at an angle of about forty-five degrees, and $4\frac{1}{2}$ to 5 feet in perpendicular height.

No definite evidence was offered of the length of said embankment, or to that part of the track which was raised to a level.

It is agreed by the parties that if the court should be of the opinion that the action could be maintained upon the facts reported, the damages should be assessed by a jury, or by an auditor; but if otherwise, the plaintiffs should become nonsuit.

*Wm. H. Y. Hackett*, for the defendant. The plaintiffs' claim for damages is founded on the difference between a perpendicular and a sloping embankment for several hundred feet, the slope occupying, perhaps, the one hundred thousandth part of the space of the whole pond, and doing no appreciable damage to the whole pond, the right to draw from which the plaintiffs possess only for four feet of the tide, and being from that part of the pond least affected by the embankment.

1. The remedy of the plaintiffs, if they have any, is misconceived. There is nothing in the qualified release of the 8th of September, 1843, which alters their remedy. If the alteration made in the structure in 1851 increased the damages to the plaintiffs, they "are not to be prejudiced in their further claim for any such increased damages." This of course means that such damages are to be ascertained and assessed according to the railroad law. This condition gives no new remedy. It simply negatives the inference of an unqualified release. It qualifies the release, but does not alter the remedy.

There is no equity in this case. It is not a suit to obtain pay for an injury, but to get money without any equivalent. The plaintiffs were once paid their damages

for the construction of the railroad in this pond, in which they have a very restricted right, and in their release they recite that they have agreed to receive $145 in full for all said damages, and for any claim for damages which may arise from a modification of said railroad structure on or in said mill-pond. Since then they have set up another claim for damages, and have received $300, and have brought this suit upon the idea that their deed of May 8, 1849, did not convey the right to slope the embankment. Be this as it may, I claim that the grant of September 8, 1843, did confer that right.

2. The defendants were authorized in and by their charter to take six rods in width from the line of Massachusetts to the line of Maine. The track in the mill-pond of course was not fenced out, and the defendants have not narrowed or waived their limits. On the contrary, they took the precaution, in the release of 1843, to procure a recognition of their chartered privileges, and the grant of the right to modify their track in said pond. This grant was in aid of and in reference to the defendants' chartered rights. It was not of a territory restricted by boundaries, but of a privilege by which the defendants acquired a vested right, which created an incumbrance upon the plaintiffs' rights. If this right was restricted by any boundary, it was to the six rods in width; and the grant was, and was intended to be, a recognition of the defendants' rights to six rods in width, and to negative the idea that the defendants had surrendered what they did not occupy. It was to obtain this grant that the money was paid. This right of the defendants could in no wise be modified by any subsequent territorial partition made by the plaintiffs. The extent of territory upon which the grant was to be exercised was the space necessary and proper, in good faith, to the enjoyment of the grant, or the chartered limits of six rods; but clearly not the narrow space of the bridge, not one quarter of six rods. The right to modify

implies the right to occupy the space necessary and proper to modify.

The defendants had the right, under their charter and the plaintiffs' grant, to occupy such space, not exceeding six rods in width, as might be required for said modification. This right is neither conferred or modified by the plaintiffs' deed of May 8, 1849, to the Portsmouth and Concord Railroad. All that the defendants have done they had a right to do under the grant of the 8th of September, 1843; and the deed of May 8, 1849, authorized the Portsmouth and Concord Railroad to receive compensation for the damages which the modification or making of the embankment occasioned.

3. Besides, the plaintiffs knew, when they conveyed to the Portsmouth and Concord Railroad, not only that the Portsmouth and Concord Railroad were to convey to the defendants, but they also knew for what purpose and to what use such conveyance was to be made, and agreed, in their deed, to postpone the payment of a part of the consideration ($300) until the space conveyed was used for the purpose contemplated by all the parties. In other words, when the $300 was paid, it was paid and received in full satisfaction for the damages occasioned by the embankment.

4. My next position is, that the defendants, having the right to make the embankment, the right to the natural slope passed as an incident; that the slope is an incident resulting from the laws of nature, and that the incident follows the principle by the laws of the land. "Incidents are needful to the well being of that to which they are incident, and the law is tender of them."

If there be any conflict between the thing granted and the territorial limits upon which the thing granted stands, the thing granted, and not the territorial boundaries, control. A grant is to be taken most strongly against the grantor. That this action could not be maintained, even

if the defendants had no rights except those granted by the plaintiffs' deed of May 8, 1849.

5. The defendants hold their rights under the grant of the 8th of September, 1843, and not under the deed of May 8, 1849. The only effect the last named deed had upon the defendants was to assign to the Portsmouth and Concord Railroad the right to receive the damages for the making said embankment.

6. In addition to the grant from the plaintiffs of the privilege of modifying their structure in said pond, the defendants have a grant to make the embankment and slope as they made them, from the owners of the pond and from the Portsmouth and Concord Railroad.

The owners of the pond had previously granted to George Raynes a right to draw water from said pond, to carry his saw-mill; a mill which would use more water in one tide than this slope would displace in a year. It does not appear that the plaintiffs ever denied the right of the owners of the pond to make either of the above named grants.

7. But there is another conclusive answer to this claim. I say that the plaintiffs have assigned all their rights and remedies against the defendants to the Portsmouth and Concord Railroad, by their deed of May 8, 1849, and that the defendants have settled with and paid said Portsmouth and Concord Railroad, and that said $300 was paid by the defendants to the Portsmouth and Concord Railroad, and by them to the plaintiffs, and by the plaintiffs received in full satisfaction of this cause of action.

The grant from the plaintiff to the defendants is in its nature indivisible, and is in no wise affected by any subsequent partitions in the pond. It was a grant for good consideration, under seal, duly recorded, and conferred upon the defendants rights, and created an incumbrance upon the plaintiffs' property. The defendants, in 1851, found the Portsmouth and Concord Railroad with a deed

from the plaintiffs of all their right, title, claim and demand in and unto that part of the pond where the defendants' bridge then stood. The defendants then paid the Portsmouth and Concord Railroad $300 "for a privilege of filling up and making solid that space under said bridge, together with the right of sloping, by bank-wall or otherwise, the northern side of said embankment unto said mill-pond."

The defendants have placed their embankment in the same place where the bridge stood when the plaintiffs' grant was made. If the embankment at the bottom is a few feet wider than the bridge was, the increased width results necessarily from the depth of the water, and the natural slope of an embankment which occupies the place where the bridge stood.

Under these circumstances I claim that the Portsmouth and Concord Railroad were possessed of all the rights of the plaintiffs against the defendants for increased damages for the modification of the defendants' track in said mill-pond, and for this reason this action cannot be maintained.

*Hatch,* for the plaintiffs.

1. The plaintiffs have valuable rights in the North mill-pond, which the defendants have abridged, under license from the plaintiffs, and to the injury of the plaintiffs.

The defendants have admitted the plaintiffs' rights, by previous payments to them for similar damages, and by accepting grants from them. *Woodman* v. *Tufts,* 9 N. H. 88 ; *Cowles* v. *Kidder,* 24 N. H. (4 Foster) 379.

2. The damages for which this suit is brought have never been paid, as the defendants allege.

3. The charter of the defendants is no bar to this action. It does not appear that the defendants ever laid out their road through the pond, under their charter, nor that the acts complained of were within the six rods limited in the charter..

The legislature did not and could not give to the defendants the right to take the plaintiffs' property without payment.   The pond is not navigable tide water.

4. The plaintiffs have not parted with their rights by their deed to the Portsmouth and Concord Railroad.   The defendants have transgressed the limits of that conveyance, by a bank several hundred feet long, five feet high, seven and a half feet wide at the top, and twelve and a half at the bottom, if they have not to a much broader extent.

The words in the plaintiffs' deed cannot be enlarged by parol evidence; 1 Greenl. Ev., sec. 275; and in fact there is no evidence of any understanding between the parties broader than the terms of the deed.   Nor is the right claimed by the defendants an "incident" to the grant.   So broad an incident might cover the whole of the plaintiffs' mill-pond.

If the grant to the Portsmouth and Concord Railroad, in 1849, covers, as the defendants allege, all the rights and remedies of the plaintiffs and defendants, it also limits the rights of the defendants to fill the pond, and, as to great part of the embankment in question, the defendants are mere trespassers.

5. The grant of the plaintiffs to the defendants, in 1848, is not indivisible.   It may be cause of successive action; and the deeds to the Portsmouth and Concord Railroad, and from them to the defendants, are in fact one transaction, and amount to the same as if the conveyance were directly from the plaintiffs to the defendants.

6. The deed of the plaintiffs to the Portsmouth and Concord Railroad excepts and reserves all the rights, &c., which had been conveyed to the defendants.   This amounts to a reservation to the plaintiffs of a right to recover of the defendants for all they should fill into the pond, whether within the limits of the grant to the Portsmouth and Concord Railroad, or not.

7. Assumpsit is the proper remedy. The injury was done under grant or license of the plaintiffs, and they are estopped from treating the acts of the defendants as a tort. 1 Chitty's Pl. 104–107; *Birch* v. *Wright,* 1 T. R. 387; *Shepherd* v. *Little,* 14 Johns. 212; *Clough* v. *Hosford,* 6 N. H. 231; *Hale* v. *Handy,* 26 N. H. (6 Foster) 210; *Davis* v. *Morgan,* 4 Barn. & Cress. 8; *Sutherland* v. *Lishnan,* 3 Esp. 42; *Feltham* v. *Terry,* Cowper 419.

To case or trespass, license might have been pleaded. 1 Chitty's Pl. 505.

SAWYER, J. It may be assumed, that, by the release of September 8, 1843, executed by two of the plaintiffs, and the assent of the other two to the arrangement, with the defendants, as therein expressed, the Eastern Railroad was licensed, or otherwise authorized to maintain and use their bridge as it then was, and were also empowered to modify the structure at any future time, in any way that the purposes of the corporation might require. No question is made, and there is perhaps no ground for raising a question, that the change in the character of the structure, from a bridge, supported on piles, to a solid embankment of earth, was such a modification of the structure as to come fairly within the meaning of the terms employed in the release. The release acknowledges the receipt of one hundred and forty-five dollars as the consideration paid therefor; and it contains, in addition, a recital in the preamble, that that sum, it was agreed, was to be received in full for all damages which had been occasioned by the construction of the bridge, and for any future damages which might arise from a modification of it. There is, however, a provision contained in the body of the release, that if the present structure shall be so altered as to increase the damages, by diminishing the quantity of water in the mill-pond, or impairing its efficiency, the plaintiffs are not to be prejudiced in their further claim for

the additional damages beyond the sum agreed upon. It is clear that the construction to be given to the instrument, upon a view of all its terms, is that the plaintiffs acknowledge satisfaction of all damages, past and prospective, arising from the bridge as it then was or as it might be by reason of any change of the structure, excepting only such additional damages as the alteration might occasion in diminishing the quantity of water, and impairing the efficiency of the pond to operate their mill. The release was not to prejudice their claim for these additional damages. All other damages which the alteration might occasion, as well as all which the bridge had caused, or might thereafter cause, in its then condition, were released, and the sum received in consideration of the release was paid in satisfaction of these damages. For the damages resulting from any future modification of the bridge, in diminishing the quantity of water, or impairing the efficiency of the pond, and for these only, the plaintiffs stipulated for further compensation, the amount of which was left indeterminate. If, then, without the grant by the plaintiffs of any further right, the defendants had proceeded to make the alteration, by substituting the solid embankment as the foundation for their superstructure, in place of the support by piles, and thereby further damages had been occasioned to the plaintiffs, in diminishing the capacity of the pond, or otherwise impairing its efficiency, the plaintiffs would have been entitled to further compensation, commensurate to the additional damages. And it is not perceived what remedy they would have had for recovery of that compensation, except by action of assumpsit upon the implied promise to pay such sum as might be a just remuneration for the injury. Whether the transaction might be regarded as a license by the plaintiffs to make the alteration, or whether it might be considered as amounting to a grant of the right — as upon a contract for a valuable consideration — in either view it was made

upon the express condition that the plaintiffs should be entitled to claim the additional compensation. The defendants, in exercising the right without further authority from the plaintiffs, must have been held to agree to the condition proposed. If the right to make the alteration rests upon the release executed by two of the plaintiffs, and the assent of the others to the arrangement therein expressed, the right must be exercised in conformity with the terms of the arrangement; and in the proceedings it is clearly implied that if the defendants choose to avail themselves of the right which it gives, they shall make just compensation for the additional damages. Having exercised the right upon that understanding, the promise to pay, sufficient to support the action of assumpsit, is implied.

Assuming, then, for the present, that the authority of the defendants to make the alteration is to be found only in the transaction of September, 1843, upon the facts stated, it is manifest that the plaintiffs may have sustained the additional damages contemplated. Their mill is operated mainly by tide-water. The supply of water received into the pond at each flood is exhausted by operating the mills upon it at each ebb. It is the right of the plaintiffs to operate their mill until the pond is drawn down to a designated point; and this it is stated usually occurs at about half tide. They may then be required to suspend. It is obvious, therefore, that any cause which has the effect to contract the capacity of the pond, thereby diminishing the volume of water to be discharged during the ebb tide, must have the effect to abridge the time they may have the right to run their mill at each ebb, and thus to a greater or less extent impair its value.

There can be no doubt that the solid embankment, in place of the support by piles, diminishes the capacity of the pond and the volume of water; whether or not to an appreciable extent, and to the damage of the plaintiffs, are

facts not stated in the report. If these facts exist, the plaintiffs' right of action under that arrangement is clear. The question then arises, whether they have barred themselves from the right by any proceeding subsequent to the arrangement of September, 1843.

By their deed to the Portsmouth and Concord Railroad of the 8th of May, 1849, they released and quitclaimed a portion of the mill-pond described by definite boundaries. The release was executed before the acts complained of; and consequently, so far as those acts were confined to the limits of the premises released, the plaintiffs have no right to compensation for the loss of the water of the pond to the extent of those limits, unless it be in virtue of some exception or reservation to that effect, contained in the deed. Under this deed the grantees — the Portsmouth and Concord Railroad — as to these plaintiffs are to be considered the owners in fee of the territory included within the boundaries of the premises released, and they embrace, with other land, that also upon which the bridge stood as it was then constructed. The quitclaim by the plaintiffs of all right to a portion of the pond, marked by definite boundaries, leaves them at least no ground upon which to question that the party to whom they have released is entitled, as the owner, to occupy and enjoy the land in as full and ample manner as in the case of any owner of the fee under a deed of warranty, unless restrained by some provision contained in the deed. The description is of a part of the mill-pond. By the term 'pond,' the land covered with the water of the pond passes. In Co. Lit. 5, it is said, "if a man grant *aquam suam*, the soil shall not pass; but by the name *stagnum* — a pool, the water shall pass, and the land also. So *gurges* — a gulf, is water and land; and therefore by grant thereof by that name the soil doth pass." The word pond is as effectual to pass the soil as pool or gulf.

The Portsmouth and Concord Railroad, then, had the right, unless so restrained, to fill up the pond through the whole extent of the portion released, including the ground occupied by the bridge; and they could convey to others, as against the plaintiffs, the title to the whole or any portion of the premises released, and with it the same right of raising the whole or any portion of the surface above the flow of the tide. This they did by their deed to the defendants of May 8, 1850, to the extent of the ground covered by the bridge in its then condition.

The question, then, to be considered is, whether the release from the plaintiffs to the Portsmouth and Concord Railroad contains any provisions limiting the rights which ordinarily attach upon a conveyance in fee, in the use and enjoyment of the land conveyed, and restraining them from filling up that portion of the pond occupied by the bridge. If they are not restrained, their grantees — the defendants — are not. The clause in the deed, which, it is claimed by the plaintiffs, amounts to such restriction, is in these words: " Saving, excepting and reserving all rights, titles, interest and privileges which have been heretofore by us, or any or either of us, conveyed to said Eastern Railroad." The rights and privileges here intended must be understood to be the right to maintain the bridge, and the right to modify it in any manner which the purposes of the corporation may require, upon making compensation to the plaintiffs for the actual damages. These rights, it may be conceded, had been conveyed by the plaintiffs to the defendants, and were thus within the terms of the exception; and the Portsmouth and Concord Road were consequently restrained from any use or enjoyment of the premises which would violate or impair the rights reserved to the Eastern Road. But they would be restrained no farther. These rights merely constituted an easement, and the Portsmouth and Concord Road took the estate subject to it. They were at liberty to devote

the land to any use, or occupy it in any way which would leave to the defendants the use of their bridge, and the privilege of modifying it as they might find occasion; and with their rights in this respect the filling up of the pond by the Portsmouth and Concord Road would have interfered in no way to which they could object. The substitution of a solid embankment for the water of the pond under the bridge, would not have interrupted the easement, nor rendered them less able to exercise the right of altering the bridge. If the purposes of the Portsmouth and Concord Road had required it, for their convenient use of the premises, they might have proceeded, even against the will of the Eastern Road, to make the embankment, within the limits of the premises released, precisely as it was made by the defendants; for it would not have been inconsistent with the enjoyment by them of their easement. If they could do it under the deed from the plaintiffs, they could empower the defendants to do it, also, by conveying the premises to them.

But if the Portsmouth and Concord Road should be held to be restrained from making the embankment, as against the Eastern Road, because it would be inconsistent with the enjoyment of the easement, still the plaintiffs have no claim for compensation, so far as relates to acts confined to the land released, upon other grounds, arising from the nature of the exception.

If any right is reserved to the plaintiffs under the clause in question, it is either because it in effect excepts some part of the thing granted from the operation of the grant, so that it does not pass by the demise — thus constituting a technical exception in the deed — or because it creates and reserves to the grantor a new right, not before *in esse,* and not a part of the thing granted, but springing from it, like rent or an easement reserved, and thus constituting a technical reservation.

In 1 Shep. Touch. 77, an exception is defined to be a clause in the deed whereby the grantor excepts somewhat out of that before granted; and it is said every exception must be of part of the thing granted, capable of being severed from it, and not an inseparable incident; and "such that he that doth except may have, and doth properly belong to him." Instances given are a grant by one of all his lands in Essex, except or saving his lands in Dale, or all his lands in Dale, except a certain house. A reservation is said, p. 80, to be a clause whereby the grantor reserves some new thing to himself out of that which he has granted, but not part of it, nor a thing *in esse*, until created by the reservation. Such are a right of way, of fishery, or other incorporeal right, created at the time of the grant, and reserved to the grantor out of the land. In Co. Lit. 47, (b,) it is said, "Note the diversity between an exception which is even part of the thing granted, and of a thing *in esse*, and a reservation, which is always of a thing not *in esse*, but newly created, or reserved out of the thing demised." The distinction is recognized in *Cocheco Manufacturing Co.* v. *Whittier*, 10 N. H. 305; *Thompson* v. *Gregory*, 4 Johns. 81.

If the clause, then, is to have the effect to retain to the plaintiffs, as against the operation of the quitclaim, the right to recover damages for filling up the pond beneath the bridge, it must be either because the land covered by the bridge is intended to be excepted in the use of the terms, — 'excepting the rights, titles, interest and privileges conveyed to the Eastern Road' — thus giving to the clause the character of a technical exception, exempting this land from the demise, or because it creates a new incorporeal right in the grantors, arising out of the land, not before *in esse*, like rent reserved, the easement of a way, or the like; and which, in this case, can be only the rights to modify, maintain, and use the bridge so modified. Either construction is alike inadmissible. To construe

the clause as an exception reserving the land, would be in effect to hold that a clause in a deed of land, with an existing public or private way upon it, excepting the way, would reserve to the grantor an estate in fee in the land occupied by the way. To construe it as the reservation of an easement would convert the easement described in the excepting clause as an existing right in the Eastern Railroad into a new easement, thereafter to be held and enjoyed by the grantors. If the conveyance to the Portsmouth and Concord Road had been by deed of warranty, with the usual covenant against incumbrances, it would be manifest that the object and effect of the clause would be merely to except the easement from the operation of the covenant. In a naked quitclaim it may perhaps have the effect to impart notice to the grantees of the claim, of right made by the Eastern Road to maintain, modify and use the bridge, and of the transactions of 1843, upon which their claim is founded, and thus to secure them in equity, perhaps in law, against the interruption of the easement by the Portsmouth and Concord Road. It can have no effect and operation beyond this. Thus far the discussion has proceeded upon the assumption that the acts of the defendants in making the embankment were confined to the limits of the premises described in the release, and for these acts the plaintiffs have no claim for damages. But if, in filling in for the embankment, or otherwise modifying the structure of the bridge, they have passed beyond those limits, and thereby damages have been occasioned, the right of the plaintiffs to compensation rests upon the implied agreement to pay, under the arrangement of 1843; and as to these damages they have done nothing to bar themselves from maintaining this action therefor.

The boundary of the premises is described as the northerly side line of the bridge. By this must be understood the bridge as it was at the time of the conveyance. It is

described as constructed of timbers placed as stringers lengthwise of the road, upon transverse caps, resting on piles, and projecting on each side of the road some inches beyond the stringers. The projecting ends of the caps constituted the extreme points of the bridge laterally. A line from cap to cap on the northerly side of the bridge, touching their projecting ends, and continued to the eastern shore, would have left all parts of the foundation and superstructure upon its southerly side. Beyond this line there was nothing to indicate a limit as the northerly side line. The premises released are therefore bounded by that line. For any diminution of the capacity of the pond by the material placed in it beyond this boundary, in making the embankment and occasioning actual damages to the plaintiffs by impairing the use of their mill, the defendants are liable. This is to be determined upon an inquiry into the damages by the jury, or by an auditor, as provided in the case transferred.